## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GERALD MANOWITZ, as trustee of the Annette Clair Manowitz revocable trust, on behalf of itself and all others similarly situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | **TRIAL BY JURY DEMANDED** |
| OPTIONABLE INC., KEVIN CASSIDY, EDWARD J. O' CONNER, and MARK NORDLICHT, | |
| Defendants | |

**07 CIV. 3884**

Plaintiff alleges the following for his Complaint in the above-captioned matter. Plaintiff so alleges individually and on behalf of all persons and entities (the "Class") who purchased the common stock of Optionable Inc. ("Optionable" or the "Company"), between May 6, 2005 through May 11, 2007, inclusive (the "Class Period"). The allegations contained herein are made upon information and belief, except as to the allegations about Plaintiff and his counsel, which are made upon personal knowledge. Plaintiff's information and belief is based, among other things, on investigations made by and through his attorneys. Such investigation included, but has not been limited to, the review and analysis of (a) filings made by Optionable with the United States Securities and Exchange Commission (the "SEC"); (b) press releases issued by the Company; (c) newspaper, magazine, and other periodical articles relating to Optionable and the allegations contained therein; and (d) other matters of public record.

### I.    NATURE OF THE ACTION

1.    This is a class action on behalf of all purchasers of the common stock of Optionable during the Class Period, seeking to pursue remedies under the federal securities laws.

2.      Optionable purports to be a provider of natural gas and other energy derivatives trading and brokerage services.

3.      Throughout the Class Period, Optionable issued false statements and made material omissions regarding its business fundamentals and financial results. While touting its continued success, Defendants failed to disclose the enormous dependence it had on its largest client, the Bank of Montreal ("BMO"), and that Optionable improperly concealed material losses incurred by BMO in connection with trades BMO transacted through Optionable.

4.      On April 27, 2007, BMO disclosed that it had lost between $300 to $400 million in trades executed through Optionable.  On that day, the price of Optionable stock declined from a previous day closing price of $8.29 per share, to a closing price of $5.56 per share, a single day decline of $2.73 per share or 33% on heavier than usual volume.

5.      On May 2, 2007, Defendant Mark Nordlicht ("Nordlicht"), who served as Chairman and Director during the Class Period, resigned from both positions.  On May 2, 2007, Optionable shares declined from a price of $5.34 per share at the close of trading on May 1, 2007, to close at $4.82 per share at the close of trading on May 2, 2007, a decline of $0.52 per share or approximately 10%.

6.      On May 8, 2007, after the close of trading, BMO announced that it was "suspending all of its business relationships" with Optionable and "all derivatives trading through that firm, pending the results of a full external review which is ongoing." BOM also announced that two of its commodity trading professionals were on leave pending the results of the external review.

7.      On May 9, 2007, Optionable shares declined from a close on May 8, 2007 of $4.64 per share to close at $2.61 per share on May 9, 2007, a decline of $1.83 per share or approximately 39% on heavier than usual volume.

2

8.      On May 10, 2007, it was disclosed that Deloitte & Touche LLP ("Deloitte") had conducted an audit of, and prepared a report in connection with, the trades BMO had conducted with Optionable. According to *Bloomberg,* the Deloitte report stated that there had been "serious mismarkings" of natural gas options and that the "auditors had never seen such a wide discrepancy between the pricing in the bank's portfolio and their market value." On May 10, 2007, Optionable shares declined from a close on May 9, 2007 of $2.81 per share, to close at $0.84 per share, a decline of $1.96 per share or approximately 70%.

9.      On May 14, 2007, Optionable disclosed the "resignation" of its Vice Chairman, CEO and Director, Defendant Kevin Cassidy ("Cassidy"). It was also disclosed that the New York Mercantile Exchange, which acquired a 19% stake in the Company on April 19, 2007, was concerned about recent developments at Optionable and was quitting its seat on the board of the Company.

10.     On May 14, 2007, Optionable shares declined from a close of $1.01 per share on May 11, 2007, to close at $0.42 per share on May 14, 2007, a decline of 58% on heavier than usual volume.

11.     During the Class Period, Defendants sold artificially inflated stock for proceeds of over $28 million.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to: (a) Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and (b) 28 U.S.C. §§ 1331 and 1337.

13.     This action arises under and pursuant to: (a) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); (b) Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (c) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

### III.    PARTIES

15.     Plaintiff purchased Optionable common stock during the Class Period, as set forth in the attached Certification, and was damaged thereby.

16.     Defendant Optionable is a corporation organized under the laws of the state of Delaware. It maintains its principal place of business at 465 Columbus Avenue, Valhalla, NY 10595.

17.     Defendant Cassidy served as Optionable's Chief Executive Officer, Vice Chairman and Director during the Class Period.  Cassidy sold 1,905,000 artificially inflated Optionable shares for proceeds of approximately $5.1 million.

18.     Defendant Edward J. O'Connor ("O'Connor") served as the Company's President and Director during the Class Period.  Defendant O' Conner sold 1,853,886 artificially inflated Optionable shares for proceeds of approximately $5 million.

19.     Defendant Nordlicht served as Chairman and Director during the Class Period. Defendant Nordlicht sold 7 million artificially inflated Optionable shares for proceeds of approximately $18.8 million.

20.     Defendants referred to in paragraphs 17-19 are referred to herein as the "Individual Defendants."

### IV.    CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons who purchased the common stock of Optionable during the period from May 6, 2005 through May 11, 2007, inclusive (the "Class").

22.      The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at the present time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members of the Class located throughout the United States. Throughout the Class Period, Optionable had over 52 million shares of common stock issued and outstanding, which were actively traded in an efficient market.

23.      Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have sustained damages because of defendants' unlawful activities alleged herein. Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously. The interests of the Class will be fairly and adequately protected by plaintiff. Plaintiff has no interests which are contrary to or in conflict with those of the Class that plaintiff seeks to represent.

24.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

25.      Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)      whether defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)      whether defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)    whether the members of the Class have sustained damages and the proper measure of such damages.

## V.    FALSE STATEMENTS AND MATERIAL OMISSIONS

26.    In a Registration Statement and Prospectus (collectively, the "Registration Statement") issued in connection with its May 6, 2005 initial public offering of 31,431,026 shares at $0.20 per share, which was signed by Defendants O'Conner and Nordlicht, Optionable made the following representation concerning the Bank of Montreal: "One of our customers, Bank of Montreal, accounted for approximately 10% of our revenues during 2004. Two of our customers, Bank of Montreal and Coral Energy Holding, L.P., accounted for approximately 17% and 10%, respectively, of our revenues during 2003."

27.    On March 15, 2006, Optionable filed annual report for the year ended December 31, 2005 with the SEC on Form 10-K. The annual report, which was signed by Defendants Nordlicht, Cassidy and O'Conner, represented that the Bank of Montreal accounted for 18% of its revenues during 2005.

28.    On July 25, 2006, the Company issued a press release stating in part:

Optionable Reports Record Results and Strong Growth for Second Quarter 2006

BRIARCLIFF MANOR, N.Y., July 25 /PRNewswire-FirstCall/ -- Optionable, Inc. (OTC Bulletin Board: OPBL), a rapidly growing provider of natural gas and other energy derivatives brokerage services, today announced record results from operations for the quarter ended June 30, 2006 . . .

"We are pleased to be able to report continued strong year over year growth in the volume of options traded along with the growing demand for our brokerage services," said Kevin Cassidy, chief executive officer of Optionable. "We continued to see strong demand for natural gas contracts even as we moved out of the traditional peak demand during the winter heating months in the northeast. Our continued growth reflects our ability to execute trades in a demanding market and provide our customers with broad access to counterparties."

29.    On October 26, 2006, the Company issued a press release which stated in part:

Optionable Inc. Reports Record Results for the 2006 Third Quarter, First Nine Months

BRIARCLIFF MANOR, N.Y., Oct. 25 /PRNewswire-FirstCall/ -- Optionable, Inc (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced today record results from operations for its third quarter and nine months ended September 30, 2006, posting strong gains in revenue, net income and EPS . . . .

CEO Kevin Cassidy commented, "It is clear from the recent news headlines that there is increased interest in derivatives trading. And we feel that the best is yet to come for Optionable. Our record results for the third quarter have primarily been achieved through traditional means of service of delivery, voice-brokerage and open outcry. Our electronic platform, OPEX, which we recently introduced, will gain adherents in the energy commodities markets and, ultimately, with other commodities markets. The latest addition to our services offering, OPEXAnalytics, enables us to offer a broader variety of solutions to satisfy our clients' needs. We certainly would not be where we are without providing consistent, timely, and outstanding quality services to our clients. "

30.    On February 6, 2007, the Company issued a press release announcing its 2006

Fourth Quarter and Full Year results. It stated in part:

Optionable Reports Record Results for the 2006 Fourth Quarter and Full Year Revenue and Net Income Increase to All Time Highs

VALHALLA, N.Y., Feb. 6 /PRNewswire-FirstCall/ -- Optionable, Inc. (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, announced today record results for its fourth quarter and year ended December 31, 2006. . . .

Commenting on the results, Optionable CEO Kevin Cassidy said, "2006 was a benchmark year for us, with the launch of our electronic trading platform, OPEX(R), as well as our Analytics service. We're particularly happy with these results as they are due almost entirely to our customers' positive response to the innovative and impeccable service we delivered to them. These results also demonstrate a very healthy and largely untapped market for our derivative brokerage services.

31.    On March 9, 2007, the Company issued a press release announcing further growth

in its business. It stated in part:

Optionable Announces Trading of Swap Contracts on OPEX(R)

VALHALLA, N.Y., March 9 /PRNewswire-FirstCall/ -- Optionable, Inc. (OTC Bulletin Board: OPBL), a leading provider of natural gas and other energy derivatives

brokerage services, announced the availability of seven new swap contracts on its OPEX platform.

Optionable President Edward O'Connor said, "We believe that the addition of the swap contracts is a logical extension and outgrowth of our trading services business. We are continuously executing our strategy and diversifying our product line to help our clients maximize the opportunities in the market. By adding the swaps contracts to our platform, it will allow our customers a wider variety of trading products and provide greater volume of trading.

32.     On March 23, 2007, Optionable filed its annual report with the SEC on Form 10-K. The annual report, signed by Defendants Nordlicht, Cassidy and O'Conner, represented that the Bank of Montreal accounted for 24% of its revenues during 2006.

33.     The statements above were materially false and misleading because Defendants failed to disclose the material dependence it had on its largest client, the Bank of Montreal and that Optionable improperly concealed material losses incurred by BMO in connection with trades BMO transacted through Optionable.

## VI.     THE TRUTH BEGINS TO BE REVEALED

34.     On April 27, 2007, the Bank of Montreal ("BMO") disclosed that it had lost between $300 to $400 million in trades executed through Optionable. On that day, the price of Optionable stock declined from a previous day closing price of $8.29 to a closing price of $5.56, a single day decline of $2.73 per shre or 33%.

35.     On April 30, 2007, Mark DeCambre, writing for *TheStreet. com*, explained that as a practical matter, based on fees received by BMO and others related directly to the deals for which Optionable served as BMO's broker, BMO accounted for 86% of Optionable's brokerage fees.

36.     Notwithstanding the material losses incurred by a substantial client of Optionable's, Defendants continued to paint a rosy picture about the current status and outlook of the Company, and its seriously deteriorating relationship with BMO. On a conference call with

investors on May 1, 2007, Defendant Cassidy stated that "[w]e [Optionable] still have all of our customers. They said they are going to stay in the business. They probably have more supervisory around the risk right now." According to a Bloomberg article about this conference call,

> There's no indication from the Toronto-based bank [BOM] that it will be doing less business with the Valhalla, New York-based brokerage, Chief Executive Officer Kevin Cassidy said today in a conference call.

It was also revealed on this conference call that BMO accounted for $2.7 million of Optionable's $9.1 million of revenue in that quarter.

37.     On May 1, 2007, Defendant Nordlicht resigned.

38.     On May 9, 2007, the Company issued the following statement:

> VALHALLA, NY (May 9, 2007) .... Optionable Inc, (OTCBB: OPBL), a leading provider of natural gas and other energy derivatives brokerage services, said today that one of its clients recently incurred some losses that have become a subject of public discussion. Albert Helmig, Optionable Chairman, said, "Gains and losses are both inevitable in trading energy derivatives. We are never pleased when losses dominate for one of our clients, but we do not design or help to design their strategies, nor are we financial advisors. We provide brokerage and execution services for trades that we are instructed to make by our clients. We believe strongly that our brokerage and execution services are and have been rendered appropriately, professionally and correctly."

39.     Finally, on May 10, 2007, it was disclosed that Deloitte & Touche LLP had conducted an audit of, and prepared a report in connection with, the trades BMO had conducted with Optionable. BMO had engaged Deloitte in early February to conduct the audit and received the final report in late April.

40.     According to the report, Deloitte found there had been "serious mismarking of the book of natural-gas options," and that it had "never seen such a wide discrepancy in terms of pricing" between the values marked in BMO's portfolio of natural-gas options and their market

value. According to news reports, the Deloitte report indicated that some of the prices used in BMO's mismarked book of trades were provided by Optionable.

## VII.   LOSS CAUSATION/ECONOMIC LOSS

41.        During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Optionable's stock price and operated as a fraud or deceit on Class Period purchasers of Optionable common stock by misrepresenting the Company's operating condition and future business prospects.  Defendants achieved this by making positive statements about Optionable business and projecting strong earnings for the Company while they knew that the Company was suffering from a variety of adverse factors which were then negatively impacting its financial results, as detailed herein. Later, however, when defendants' prior misrepresentations were disclosed and became apparent to the market, the price of Optionable stock fell precipitously as the prior artificial inflation came out of Optionable's stock price. As a result of their purchases of Optionable common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

## VIII.   FRAUD-ON-THE-MARKET DOCTRINE

42.        At all relevant times, the market for Optionable common stock was an efficient market for the following reasons, among others:

(a)        The Company's common stock was actively traded in an efficient market;

(b)        As a regulated issuer, the Company filed periodic public reports with the SEC; and

(c)        The Company regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

43.    As a result, the market for the Company's common stock promptly digested current information with respect to Optionable from all publicly available sources and reflected such information in the price of the Company's common stock.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the common stock of Optionable at artificially inflated prices and a presumption of reliance applies.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

44.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Optionable, their control over, and/or receipt and/or modification of Optionable's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Optionable, participated in the fraudulent scheme alleged herein.

45.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants, who sold Optionable shares at artificially prices for proceeds of over $28 million.

46.     Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of Optionable, issued statements and press releases on behalf of Optionable and had the opportunity to commit the fraud alleged herein.

## X.    NO SAFE HARBOR

47.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Optionable who knew that those statements were false when made.

## FIRST CLAIM FOR RELIEF

### For Violation of Section 10(b) of the 1934 Act

### and Rule 10b-5 Against All Defendants

48.     Plaintiff incorporates ¶¶1-47 by reference.

49.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50.      Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)      Employed devices, schemes and artifices to defraud;

i.      Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

ii.      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Optionable common stock during the Class Period.

51.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Optionable's common stock. Plaintiff and the Class would not have purchased Optionable common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

52.      As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Optionable common stock during the Class Period.

## SECOND CLAIM FOR RELIEF
### For Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants

53.      Plaintiff incorporates ¶¶1-47 by reference.

54.      The Individual Defendants acted as a controlling person of Optionable within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

55.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

56.    As set forth above, Optionable and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Optionable's and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

14

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 17, 2007                     Respectfully submitted,

                                        KAPLAN FOX & KILSHEIMER LLP

                                        By: _____
                                                  Donald R. Hall

                                        Frederic S. Fox (FF-9102)
                                        Donald R. Hall (DH-0273)
                                        Jeffrey P. Campisi (JC-7264)
                                        805 Third Avenue, 22nd Floor
                                        New York, NY 10022
                                        Telephone:  (212) 687-1980
                                        Facsimile:  (212) 687-7714

                                                    -and-

                                        WITES & KAPETAN, P.A.
                                        Marc A. Wites
                                        4400 North Federal Highway
                                        Lighthouse Point, FL 33064
                                        (954) 570-8989
                                        954-354-0205 (fax)

                                        *Attorneys for Plaintiff*

15

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Gerald Manowitz, as trustee of the Annette Clair Manowitz Revocable Trust, hereby certify and swear as follows:

1. I have reviewed the attached Complaint against Optionable Inc. alleging violations of the securities laws and authorize its filing;

2. I am willing to serve as a representative party on behalf of a class, or to be a member of a group representing a class, including providing testimony at deposition and trial, if necessary;

3. I have not within the 3-year period preceding the date hereof sought to serve, or served, as a representative party on behalf of a class in an action brought under the federal securities laws, unless noted hereafter: _____

The following is a description of my transactions during the class period specified in the Complaint in the common stock of Optionable Inc. (5/6/2005-5/11/2007):

| Security | Transaction | Trade Date | Price Per Share |
|---|---|---|---|
| Optionable Inc. | Purchase -1,000 shares | May 4, 2007 | $4.32/share |

4. I did not purchase shares of Optionable Inc. at the direction of my counsel or in order to participate in any private action under the federal securities laws;

5. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Date: __5/8/07__, 2007

_____
Gerald Manowitz as trustee of
the Annette Clair Manowitz Revocable Trust